G. MARK ALBRIGHT, ESQ. (NV Bar # 1394)
DANIEL R. ORMSBY, ESQ. (NV Bar # 14595)
ALBRIGHT, STODDARD, WARNICK
& ALBRIGHT
801 S Rancho Dr., Ste D4
Las Vegas, NV 89106
(702) 384-7111

MARK C. RIFKIN, ESQ. (Pro Hac Vice forthcoming)
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
270 Madison Ave., 9th Floor
New York, NY 10016
(212) 545-4600
***Attorney for Plaintiff***

**UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA**

| | |
|---|---|
| ROY STRASSMAN, Derivatively on Behalf of MARATHON DIGITAL HOLDINGS, INC. (f/k/a MARATHON PATENT GROUP, INC.), <br><br> Plaintiff, <br><br> v. <br><br> FRED THEIL, GEORGES ANTOUN, KEVIN DENUCCIO, SARITA JAMES, JAY LEUPP, SAID OUISSAL, MERRICK D. OKAMOTO, AND SIMEON SALZMAN, <br><br> Defendants, <br><br> -and- <br><br> MARATHON DIGITAL HOLDINGS, INC. (f/k/a MARATHON PATENT GROUP, INC.), <br><br> Nominal Defendant. | Case No.: <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |

Plaintiff Roy Strassman ("Plaintiff"), by and through undersigned counsel, derivatively on behalf of Nominal Defendant Marathon Digital Holdings, Inc. (f/k/a Marathon Patent Group, Inc.) ("Marathon" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Marathon with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst

reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of and for the benefit of the Company, against certain of its officers and/or directors named as defendants herein seeking to remedy Defendants (defined below) violations of their breaches of fiduciary duties and other wrongful conduct as alleged herein and that occurred from October 13, 2020 through the present (the "Relevant Period").  Defendants' (defined below) actions have caused, and will continue to cause, substantial financial harm and other damages to the Company, including damages to its reputation and goodwill.

## JURSIDICTION AND VENUE

2.       This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).  Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

3.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

4.      This Court has jurisdiction over each defendant named herein. The Company is incorporated in Nevada, and because the allegations contained herein are brought derivatively on behalf of Marathon, Defendants' conduct was purposefully directed at Nevada.  Defendants have sufficient minimum contacts with Nevada so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

5.      Venue is proper in this Court because the conduct at issue had an effect in this State.

## PARTIES

**Plaintiff**

6.      ***Plaintiff Roy Strassman*** ("Plaintiff") is a current owner of Marathon's stock, purchasing Marathon stock during the time period in issue.  Plaintiff has held the stock during the

Albright Stoddard
Warnick & Albright

AS

time of the continuous wrongful course of conduct alleged herein and continues to hold Marathon stock. Plaintiff will fairly and adequately represent the interests of the stockholders in enforcing the rights of the Company.

**Nominal Defendant**

7.     ***Nominal Defendant*** Marathon is a Nevada corporation with principal executive offices located at 1180 North Town Center Drive, Suite 100, Las Vegas, Nevada 89144. The Company's common stock trades in an efficient market on the Nasdaq Capital Market ("NASDAQ") under the trading symbol "MARA".

**Director Defendants**

8.     ***Defendant Fred Thiel*** ("Thiel") was, at all relevant times, Chief Executive Officer and Chairman of the Board of Directors ("Board").

9.     ***Defendant Georges Antoun*** ("Antoun") was, at all relevant times, a Director of the Company. Defendant Antoun is a member of the Audit Committee. Defendant Antoun is the Chair of the Compensation Committee.

10.     ***Defendant Kevin DeNuccio*** ("DeNuccio") was, at all relevant times, a Director of the Company.

11.     ***Defendant Sarita James*** ("James") was, at all relevant times, a Director of the Company.

12.     ***Defendant Jay Leupp*** ("Leupp") was, at all relevant times, a Director of the Company. Defendant Leupp is the Chair of the Audit Committee. Defendant Leupp is a member of the Compensation Committee.

13.     ***Defendant Said Ouissal*** ("Ouissal") was, at all relevant times, a Director of the Company. Defendant Ouissal is a member of the Audit Committee. Defendant Ouissal is a member of the Compensation Committee.

14.     ***Defendant Merrick D. Okamoto*** ("Okamoto") was, at all relevant times, the Company's Executive Chairman and Director. On December 15, 2021, Marathon announced that Defendant Okamoto "plans to retire at the end of 2021" and that the Board "has appointed

///

1  [Defendant] Thiel, Marathon's current CEO, to succeed Okamoto on January 1, 2022, at which time,

2  Thiel will maintain the responsibilities of both Chairman and CEO."

3        15.     Defendants Theil, Antoun, DeNuccio, James, Leupp, and Ouissal are collectively

4  referred to herein as the "Director Defendants".

5  **Officer Defendant**

6        16.     ***Defendant Simeon Salzman*** ("Salzman") has served as Marathon's Chief Financial

7  Officer since October 19, 2020.

8        17.     The Director Defendants and Defendant Salzman are collectively referred to herein

9  as the "Individual Defendants."

10                **THE COMPANY'S CORPORATE GOVERNANCE**

11        18.     As members of the Company's Board, the Director Defendants were held to the

12  highest standards of honesty and integrity and charged with overseeing the Company's business

13  practices and policies and assuring the integrity of its financial and business records.

14        19.     The conduct of the Director Defendants complained of herein involves a knowing

15  and culpable violation of their obligations as directors and officers of the Company, the absence of

16  good faith on their part, and a reckless disregard for their duties to the Company and its investors

17  that the Director Defendants were aware posed a risk of serious injury to the Company.

18                **THE AUDIT COMMITTEE CHARTER**

19        20.     The Company maintains an Audit Committee Charter.  The Audit Committee Charter

20  states in relevant part:

21       **Responsibilities**

22       In carrying out its responsibilities, the Committee believes its policies and procedures

23       should remain flexible, in order to best react to changing conditions and to ensure to

24       the directors and shareholders that the corporate accounting and reporting practices

25       of the Corporation are in accordance with all requirements and are of the highest

26       quality.

27  ///

28  ///

In carrying out these responsibilities, the Committee will:

- Serve as an independent and objective party *to monitor the Corporation's financial reporting process and internal control system and complaints or concerns relating thereto*.

- To recommend, for shareholder approval, the independent auditor to examine the Corporation's accounts, controls and financial statements. The Committee shall have the sole authority and responsibility to select, evaluate and if necessary, replace the independent auditor. The Committee shall have the sole authority to approve all audit engagement fees and terms and the Committee, or a member of the Committee, must pre-approve any non-audit service provided to the Corporation by the Corporation's independent auditor.

- *Meet with the independent auditors and financial management of the Corporation to review the scope of the proposed audit for the current year and the audit procedures to be utilized*, and at the conclusion thereof review such audit, including any comments or recommendations of the independent auditors.

- Obtain and review at least annually, a formal written report from the independent auditor setting forth its internal quality-control procedures; material issues raised in the prior five years by its internal quality-control reviews and their resolution.

- Ensuring the Committee's receipt from the independent auditor of a formal written statement delineating all relationships between the auditor and the Corporation and actively engaging in a dialogue with the auditor with respect to any disclosed relationships or services that may impact the objectivity and independence of the auditor and for taking, or recommending that the full board take, appropriate action to oversee the independence of the auditor;

- Ensure that the lead audit partner assigned by the independent auditor as well as the audit partner responsible for reviewing the audit of the Corporation's financial statements shall be changed at least every five years.

- Review and appraise the audit efforts of independent auditors of the Corporation and, where appropriate, recommend the replacement of the independent accountants.

- ***Consider and approve, if appropriate, major changes to the Corporation's accounting principles and practices as suggested by the independent auditors or management***.

- Establish regular and separate systems of reporting to the Committee by management and the independent auditors regarding any significant judgments made in management's preparation of the financial statements and the view of each as to appropriateness of such judgments and additional items as required under the Sarbanes-Oxley Act including critical accounting policies.

- Review with the independent auditors and financial accounting personnel, the adequacy and effectiveness of the accounting and financial controls of the Corporation, and elicit any recommendations for the improvement of such internal control procedures or particular areas where new or more detailed controls or procedures are desirable. Particular emphasis should be given to the adequacy of such internal controls to assess and manage financial risk exposure and to expose any payments, transactions or procedures that might be deemed illegal or otherwise improper.

- Review and approve the internal corporate audit staff functions, including (i) purpose, authority and organizational reporting lines; (ii) annual audit plan, budget and stalling; (iii) concurrence in the appointment, compensation and rotation of the internal audit management function; and (iv) results of internal audits.

- *Review the financial statements contained in the annual report and quarterly report to shareholders with management and the independent auditors to determine that the independent auditors are satisfied with the disclosure and content of the financial statements to be presented to the shareholders*. Any changes in accounting principles should be reviewed.

- Prepare and publish an annual Committee report in the proxy statement of the Corporation.

- *Review with management of the Corporation any financial information, earnings press releases and earnings guidance filed with the Securities and Exchange Commission or disseminated to the public, including any certification, report, opinion or review rendered by the independent auditors*.

- Provide sufficient opportunity for the independent auditors to meet with the members of the Committee without members of management present. Among the items to be discussed in these meetings are the independent auditors' evaluation of the Corporation's financial, accounting and auditing personnel, and the cooperation that the independent auditors received during the course of the audit.

- Establish procedures for receiving and treating complaints received by the Corporation regarding accounting, internal accounting controls and auditing matters, and the confidential anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

- Submit the minutes of all meetings of the Committee to, or discuss the matters discussed at each Committee meeting with, the board of directors.

- Investigate any matter brought to its attention within the scope of its duties, with the power to retain outside advisors for this purpose if in its judgment, that is appropriate.

(Emphasis added).

21.     The purpose of the Audit Committee is to assist Marathon's Board in its oversight of accounting, financial reporting, and disclosure processes and adequacy of systems of disclosure and internal controls.  The wrongful conduct of the Director Defendants complained of herein violates the Charter of the Audit Committee.

22.     The Board of Marathon are also charged with developing and maintaining the Company's corporate governance policies and any related matters required by the federal securities laws.  The wrongful conduct of the Director Defendants complained of herein violates good corporate governance principles.

## DUTIES OF THE DIRECTOR DEFENDANTS

23.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

24.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

25.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

///

///

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

26.     Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a

reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

27. The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business opportunities, results, and prospects of the Company. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

**SUBSTANTIVE ALLEGATIONS**

**Background**

28. Marathon is a digital asset technology company that mines cryptocurrencies with a focus on the blockchain ecosystem and the generation of digital assets in U.S. The Company was formerly known as "Marathon Patent Group, Inc." and changed its name to "Marathon Digital Holdings, Inc." on March 1, 2021.

29. In October 2020, the Company announced the formation of a new joint venture with Beowulf Joint Venture ("Beowulf")—a private, independent infrastructure holding company that develops, builds, owns, and operates power generation and industrial infrastructure facilities worldwide. The Beowulf was purportedly focused on delivering low-cost power to the Company's Bitcoin mining operations. In connection with that joint venture, the Company entered into a series of agreements with multiple parties, including affiliates of Beowulf and Two Point One, LLC ("2Pl"), a Delaware limited liability company, to design and build a data center in Hardin, Montana, issuing 6 million shares of its common stock to the parties of those agreements.

**MATERIALLY FALSE AND MISLEADING STATEMENTS**

30. On October 13, 2020, Defendants caused the Company to issue a press release announcing the formation of the Beowulf (the "October 2020 Press Release"). The October 2020 Press Release represented that the Beowulf was "focused on delivering low cost power to Marathon's Bitcoin mining operations[,]" while also asserting various purported benefits that would flow to the Company in connection with that joint venture. Specifically, the October 2020 Press Release stated:

///

Marathon has entered into agreements with Beowulf to co-locate its Bitcoin Mining Data Center (the "Data Center") at the Big Horn Data Hub, which comprises 20 acres of land adjacent to Beowulf's Hardin Generating Station, a 105 MW power facility located in Hardin, Montana. Beowulf will provide power from the Hardin plant to the Data Center at a production cost of $0.028/kWh. Beowulf will also become an equity shareholder of Marathon as a result of the joint venture. Marathon will retain 100% of the Bitcoin mining output generated at the Data Center.

Marathon will deploy the 11,500 next generation S19 Pro Antminers (110 TH/s) it previously acquired through its partnership with Bitmain Inc. at the Data Center.

These miners will generate 1.265 EH/s when fully deployed, with full deployment anticipated through Q2 2021.  Currently, 500 of the S19 Pro Antminers have been delivered and deployed at the Data Center. The Data Center has the capacity to deploy up to 30,000 S19 Pro Miners that will generate 3.320 EH/s, providing Marathon with substantial opportunity for future expansion.

The Data Center will lower Marathon's aggregate mining cost for electricity and data center management to $0.034/kWh, which is 38% below the Company's current cost of mining.  This low-cost electricity reduces Marathon's breakeven costs to produce Bitcoin from approximately $7,500 per Bitcoin today to $4,600 per Bitcoin, dramatically improving the Company's future profitability.

31.     Additionally, the October 2020 Press Release quoted Defendant Okamoto, who stated that "[t]he closing of this joint venture with Beowulf represents the completion of a long journey to own a Bitcoin mining facility[,]" and that "[p]artnering with an experienced independent power producer enables us to maintain control and certainty of Marathon's energy and operational costs, at rates that represent some of the lowest in North America."

///

32.     The October 2020 Press Release also quoted Nazar Khan, Executive Vice President of Beowulf, who stated that "[i]n pursuing the co-location of a Bitcoin mining operation at Hardin, we sought to capture the inherent value to the Data Center of securing a long-term supply of reliable, secure, and low-cost power while benefitting from the significant on-site technical expertise to ensure efficient operations[,] and that the location of the Data Center has a meaningful competitive advantage on energy pricing, moderate climate, and regulatory stability."

33.     Also, on October 13, 2020, Defendants caused the Company to file a current report on Form 8-K with the SEC, which provided additional details regarding the Beowulf (the "October 2020 8-K"):

> On October 6, 2020, Marathon . . . entered into a series of agreements with affiliates of Beowulf . . . and [2Pl] . . .   Beowulf and 2Pl have been designing and developing a data center facility of up to 100-megawatts (the "Facility") that will be located next to, and supplied energy directly from, Beowulf's power generating station in Hardin, MT (the "Hardin Station"). The Facility is being developed in two phases to reach its 100 MW capacity, and the Hardin Station will supply the Facility exclusively with energy to operate Bitcoin mining servers.
>
> The projected build out cost for Phase I is approximately $14 million, which is front loaded as the infrastructure is being built most efficiently for the full 100 MW project. It entails high voltage equipment to break down the full 100 MW load from the generating station, and thereafter, the infrastructure cost per MW is a matter of distributing power at a container level. Assuming market conditions similar to current, the build out cost for Phase II works out to approximately $200,000 - $250,000 per MW. These are all in costs covering all equipment and labor needed starting from the power coming off the Generating Station distributed down to running the actual miners: including breakers, transformers, switches, containers, PDUs, fans, network cables, and the like.

Marathon and Beowulf entered into an exclusive Power Purchase Agreement for the initial supply of 30 MW (Phase I), and up to 100 MW in the aggregate (Phase II), of energy load to the Facility at a cost of $0.028/kWh. The initial term of the Power Purchase Agreement is five years, with up to five additional three-year extensions, as mutually agreed, assuming 75% energy utilization of the initial 30 MW of energy supplied to the Facility. Marathon purchased certain mining infrastructure and equipment for the Facility from Beowulf for a purchase price of $750,000, and Marathon has the right, at no additional cost, to construct and access the Facility on land adjacent to the Hardin Station pursuant to a lease agreement with Beowulf.

34. The October 2020 8-K also provided additional details regarding the Company's issuance of common stock in connection with completing, operating, and maintaining the Hardin Facility, including that "Beowulf and 2P1 will provide operation and maintenance services for the Facility pursuant to a Data Facility Services Agreement, in exchange for an initial issuance of 3,000,000 shares of Marathon's common stock to each of Beowulf and 2Pl"; that "[u]pon completion of Phase I, Marathon will issue to Beowulf an additional 150,000 shares of its common stock"; that "[d]uring Phase II, Marathon will issue to Beowulf an additional 350,000 shares of its common stock – 150,000 shares upon reaching 60 MW of Facility load and 200,000 at completion of the full 100 MW of Facility load"; and that "[a]ll shares issued under the Data Facility Services Agreement are issued pursuant to transactions exempt from registration under Section 4(a)(2) of the Securities Act of 1933."

35. On November 12, 2020, Defendants caused the Company to issue a press release announcing the Company's 2020 fiscal third quarter financial results. That press release highlighted the Company's "joint venture with Beowulf Energy for 105-Megawatt bitcoin mining data center[.]"

36. Also, on November 12, 2020, Defendants caused the Company to file a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended November 12, 2020 (the "3Q20 10-Q"). That filing contained substantively the same statements as referenced in ¶¶ 33-34, *supra*, regarding the Beowulf Joint Venture.

37.     Appended as exhibits to the 3Q20 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Okamoto and Salzman certified that "[t]he [3Q20 10-Q] fully complies with the requirements of section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [3Q20 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

38.     On November 13, 2020, Defendants caused the Company to file an amendment to the 3Q20 10-Q on Form 10-Q/A with the SEC (the "3Q20 10-Q/A). That filing contained substantively the same statements as referenced in ¶¶ 33-34, *supra*, regarding Beowulf.

39.     Appended as exhibits to the 3Q20 10-Q/A were substantively the same SOX certifications as referenced in ¶ 37, *supra*, signed by Defendants Okamoto and Salzman.

40.     On March 16, 2021, Defendants caused the Company to issue a press release announcing the Company's fourth quarter and fiscal year 2020 results (the "4Q/FY20 Press Release"). That 4Q/FY20 Press Release highlighted the "[i]nitiated construction of [the] mining facility adjacent to Beowulf's energy plant in Hardin, MT, supplying Marathon long-term access to electricity at 2.8¢/kWh[,]" and the "install[ation of] 3,697 S-19 ASIC miners at the mining facility Hardin, MT, increasing Marathon's current active mining fleet to 5,690 miners with an additional 6,641 already delivered . . . and in the process of being installed[.]"

41.     Additionally, the 4Q/FY20 Press Release quoted Defendant Okamoto: "we established our 105 MW mining facility in Hardin, MT, where we have consistent access to electricity at rates far below market average, we presciently purchased more than 100,000 of the industry's top performing Bitcoin miners . . . and we enhanced our balance sheet[,]" and that "[w]ith a solid foundation to grow the business established, we are now focused on continuing to build out our mining facility and bring our miners . . . online."

42.     Also on March 16, 2021, Defendants caused the Company to file an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2020 (the "2020 10-K"). That filing contained substantively the same statements as referenced in ¶¶ 33-34, *supra*, regarding the Beowulf Joint Venture.

///

43.     Appended as an exhibit to the 2020 10-K were substantively the same SOX certifications as referenced in ¶ 37, *supra*, signed by Defendants Okamoto and Salzman.

44.     On May 10, 2021, Defendants caused the Company to file a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2021 (the "1Q21 10-Q"). That filing contained substantively the same statements as referenced in ¶¶ 33-34, *supra*, regarding the Beowulf Joint Venture.

45.     Appended as exhibits to the 1Q21 10-Q were substantively the same SOX certifications as referenced in ¶ 37, *supra*, signed by Defendants Thiel and Salzman.

46.     On May 12, 2021, Defendants caused the Company to file an amendment to the 1Q21 10-Q on Form 10-Q/A with the SEC (the "1Q21 10-Q/A). That filing contained substantively the same statements as referenced in ¶¶ 33-34, *supra*, regarding Beowulf.

47.     Appended as exhibits to the 1Q21 10-Q/A were substantively the same SOX certifications as referenced in ¶ 37, *supra*, signed by Defendants Thiel and Salzman.

48.     On August 13, 2021, Defendants caused the Company to file a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2021 (the "2Q21 10-Q").  That filing contained substantively the same statements as referenced in ¶¶ 33-34, *supra*, regarding the Beowulf Joint Venture.

49.     Appended as exhibits to the 2Q21 10-Q were substantively the same SOX certifications as referenced in ¶ 37, *supra*, signed by Defendants Thiel and Salzman.

50.     The statements referenced above were materially false and misleading because Defendants caused the Company to make false and/or misleading statements, as well as fail to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants caused the Company to make false and/or misleading statements and/or fail to disclose that: (i) Beowulf, as it related to the Hardin Facility, implicated potential regulatory violations, including U.S. securities law violations; (ii) as a result, Beowulf  subjected Marathon to a heightened risk of regulatory scrutiny; (iii) the foregoing was reasonably likely to have a material negative impact on the Company's business and commercial prospects; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

**THE TRUTH EMERGES**

51.     On November 15, 2021, the Company filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2021.  In the "Legal Proceedings" section of that filing, the Company disclosed:

> On October 6, 2020, the Company entered into a series of agreements with multiple parties to design and build a data center for up to 100-megawatts in Hardin, MT. In conjunction therewith, the Company filed a Current Report on Form 8-K on October 13, 2020.  The 8-K discloses that, pursuant to a Data Facility Services Agreement, the Company issued 6,000,000 shares of restricted Common Stock, in transactions exempt from registration under Section 4(a)(2) of the Securities Act of 1933, as amended. ***During the quarter ended September 30, 2021, the Company and certain of its executives received a subpoena to produce documents and communications concerning the Hardin, Montana data center facility described in our Form 8-K dated October 13, 2020. We understand that the SEC may be investigating whether or not there may have been any violations of the federal securities law.  We are cooperating with the SEC.*** [Emphasis added].

52.     On this news, the Company's stock price fell $20.52 per share, or 27.03%, to close at $55.40 per share on November 15, 2021.

**DAMAGES TO THE COMPANY**

55.     The Company's performance issues also damaged its reputation within the business community and in the capital markets.  The Company's current and potential investors consider a company's trustworthiness and ability to accurately value its business prospects and evaluate sales and growth potential.  The Company's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by Defendants have materially increased the perceived risks of investing in and lending money to the Company.

///

///

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

56.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties, waste of corporate assets, and unjust enrichment.

57.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

58.     Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.

59.     Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

60.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.

61.     Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

63.     At the time Plaintiff filed this derivative action, the Company Board was comprised of six (6) members – Theil, Antoun, DeNuccio, James, Leupp, and Ouissal.  Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, three (3), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

64.     All of Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

65.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this

Albright Stoddard
Warnick & Albright

Complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

66.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

67.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

68.     Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant Theil**

69.     Defendant Theil is not disinterested or independent, and therefore, is incapable of considering demand because Defendant Theil is the Company's CEO.  As CEO of the Company, Defendant Theil is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.

70.     As such, Defendant Theil cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

71.     In addition, Defendant Theil is a defendant in the Securities Class Action entitled *Schlatre v. Marathon Digital Holdings, Inc., et al.*, Case 2:21-cv-02209-RFB-NJK (D. Nevada) (the "Securities Class Action")

72.     As such, Defendant Theil cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

**Defendants Antoun and DeNuccio**

73.     Defendant DeNuccio served in senior executive positions with Verizon, Cisco Systems, Ericsson, Redback Networks, Wang Laboratories, and Unisys Corporation.

74.     Defendant Antoun joined Ericsson in 2007, when Ericsson acquired Redback Networks, a telecommunications equipment company, where Defendant Antoun served as the senior vice president of worldwide sales & operations. After the acquisition, Defendant Antoun was promoted to chief executive officer of the Redback Networks subsidiary.  Prior to Redback Networks, Defendant Antoun spent five years at Cisco Systems, where he served as vice president of worldwide systems engineering and field marketing, vice president of worldwide optical operations, and vice president of carrier sales.

75.     These two Directors have longstanding business and personal relationships with each other that preclude them from acting independently and in the best interests of the Company and the shareholders.

**Defendants Leupp, Antoun, and Ouissal**

76.     Defendants Leupp (Chairman), Antoun (member), and Ouissal (member) are members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, these defendants were responsible for, *inter alia*, overseeing the accounting and financial reporting processes of the Company and reviewing and taking steps to remedy any deficiencies with the Company's system of internal controls. Defendants Leupp, Antoun, and Ouissal failed to adequately oversee the Company's reporting processes, failed to identify or remedy deficiencies with the Company's internal controls, and failed to cause the Company to prevent the issuance of false and misleading statements.  Thus, Defendants Leupp, Antoun, and Ouissal breached their fiduciary duties, are not disinterested, and demand is excused as to them.

**COUNT I**
**(Against the Director Defendants for Breach of Fiduciary Duty)**

77.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

///

- 19 -

78.     The Director Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

79.     The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

80.     The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.   Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to make false and misleading statements about the Company's business performance and failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls as alleged herein.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

81.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

82.     As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.

<u>COUNT II</u>
**(<u>Against the Director Defendants for Waste of Corporate Assets</u>)**

83.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

84.     The wrongful conduct alleged regarding the issuance of false and misleading statements and its failure to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls was continuous, connected, and ongoing throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

85.     As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its

- 20 -

executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

86.     As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

87.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

<u>**COUNT III**</u>
**(Against Defendants for Unjust Enrichment)**

88.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

89.     By their wrongful acts and the omissions of material fact that they caused to be made, Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

90.     Plaintiff, a shareholder and representative of the Company, seeks restitution from Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation based compensation, obtained by Defendants due to their wrongful conduct and breach of their fiduciary duties.

91.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

92.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

**COUNT IV**
**(Against Defendants Okamoto, Thiel, and Salzman for Contribution**
<u>**Under Sections 10(b) and 21D of the Exchange Act)**</u>

93.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

94.     The Company and Defendants Okamoto, Thiel, and Salzman are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these

violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Okamoto, Thiel, and Salzman's willful and/or reckless violations of their obligations as an officer of the Company.

95.     As such, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Okamoto, Thiel, and Salzman.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(A)     Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff are adequate representatives of the Company;

(B)     Finding the Director Defendants liable for breaching their fiduciary duties owed to the Company;

(C)     Directing Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

(D)     Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

(E)     Awarding such other and further relief as is just and equitable.

///
///
///
///
///
///
///
///
///
///

1

## **JURY TRIAL DEMANDED**

2

Plaintiff hereby demands a trial by jury of all issues so triable.

3

Dated: May 5, 2022.

4                                            */s/ G. Mark Albright, Esq.*
                                         G. MARK ALBRIGHT, ESQ. (NV Bar # 1394)
5                                         DANIEL R. ORMSBY, ESQ. (NV Bar # 14595)
                                         ALBRIGHT, STODDARD, WARNICK
6                                         & ALBRIGHT
                                         801 S Rancho Dr., Ste D4
7                                         Las Vegas, NV 89106
                                         (702) 384-7111
8

9                                         Mark C. Rifkin (Pro Hac Vice forthcoming)
                                         WOLF HALDENSTEIN ADLER
10                                        FREEMAN & HERZ LLP
                                         270 Madison Ave., 9th Floor
11                                        New York, NY 10016
                                         (212) 545-4600
12                                        ***Attorney for Plaintiff***

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFICATION**

I, ROY STRASSMAN, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 21st day of April 2022

_____
ROY STRASSMAN